Our fourth case for this morning is Dennis Davis v. Francis Kayira All right, Mr. Sandberg May it please the Court, Counsel. This case is about a summary judgment that is prematurely granted. In this particular case, the issues that were then before the court, limited discovery, limited discovery, limited discovery, limited discovery, limited discovery, limited discovery, limited discovery, limited discovery, limited discovery. But clear discovery was done. Most specifically, the discovery in this was medical records as well as the plaintiff's deposition and the defendant's deposition. What we learned from the defendant's own deposition is that he was aware of what happens when someone suffers from a stroke and what the symptoms are. In fact, he testified that he has treated people with stroke and stroke-like symptoms before. He also acknowledges the importance of early intervention on strokes. And so what happened here is during the relevant period of time, he was a medical director, he was working off-site, he received communications from the healthcare professional staff there that actually are nurses or CMTs. None of them are doctors, none of them can diagnose. But didn't he receive in the relevant time, meaning between the time that Mr. Davis is getting the dialysis and then the Monday morning when the doctor is actually in there, sees him, realizes he needs to go to the hospital and sends him off. I thought there was really just the one communication. Now the nurses and the CMT may have observed him more, but this doesn't seem to have made its way back to Dr. Kaira. So I think I understand what your point is. Your point is after the initial communications where the stroke symptoms were conveyed to him, what if anything else additionally prior to him arriving and with his own eyes observing that he in fact had suspected stroke and required him to be transferred away, whether or not those things were communicated to him. Well I don't think they were. As I understand this record, I'm happy to be corrected, one nurse calls him at 545 in the morning on June 21st and she's concerned. So he asks her some questions. He says to her he feels like he's lost control of his left side, he feels retarded, fuzzy, mind fuzzy, body weak. She calls Dr. Kaira. He asks is there asymmetrical grip strength, drooling or facial droop. She says no. And he's also informed that Davis has previously experienced similar symptoms during his dialysis. And as far as I know in this record, that's all Dr. Kaira is told. He invites him to call back, but nobody does call back until he sees Mr. Davis Monday morning. That's actually important to me because this is Dr. Kaira's behavior we're evaluating, not the nurses. Absolutely. And you've hit on an important topic, which is that what Dr. Kaira wanted to hear was whether or not these stroke-like symptoms or symptoms that were consistent with the stroke got worse. That was what he requested from that staff to communicate to him. But what's most important is when he was initially told about these stroke-like symptoms, a physician forms a differential diagnosis. But do we know from this record what the symptoms somebody would experience during dialysis would be? Dr. Kaira is told and thinks that the same kind of wooziness or this set of things has happened before to Mr. Davis in the middle of dialysis, which is hardly a benign procedure. It's a very significant procedure. True. Right. If I'm understanding your point, your point is... I'm just trying to figure out, what did Dr. Kaira do wrong? He's given inconclusive information, or at least in his medical judgment it seems to be inconclusive information, very early in the morning on the 21st. He says, call me back. No one calls back. And then he shows up Monday morning, realizes that this man is displaying very significant stroke symptoms and ships him off, as he could have done during the weekend but didn't do, to the hospital. And I think what may be more helpful to your honors is a jury could have concluded, based on the symptoms that were conveyed to Dr. Kaira on the 21st in the morning, that it required, it was incumbent upon him, because he was aware of what strokes and stroke-like symptoms were, and what the effect of not caring for, not treating, not referring out someone with those symptoms so that they can get that early intervention, what that meant. Was that reckless? Was that a deliberately indifferent situation that Dr. Kaira was experiencing at that time? Whether or not... So what is it that pushes us from medical judgment to recklessness in this situation? I mean, another doctor might have said, hang on, I'll come in. Or another doctor might have said, okay, I'll authorize his transfer to the ER. It's a Saturday, of course, it's difficult to get ordinary care. But if Dr. Kaira is told there's nothing asymmetrical about it yet, or nothing asymmetrical about it, he's being told that one of the classic symptoms of stroke is not present. One of them, true. One of them, yeah. And that the other symptoms are consistent with what this prisoner had experienced before in dialysis. So there's the evidence, the information he's being given is equally as attributable to his normal reaction to dialysis as it is to stroke. Right. So that can't possibly be deliberate indifference when he says, if it changes, call me back. I'm not sure that this is a situation where the district court properly found as a matter of law that it wasn't deliberate indifference. You're talking to us on a de novo review here. Right, I understand that. So just talk to us. It doesn't matter what the district court did or didn't do. Sure. And in this particular case, a finder of fact may conclude that given that constellation of symptoms that Dr. Kaira was told about on the 21st, and Dr. Kaira's own knowledge about the importance of dealing with stroke and stroke-like symptoms in patients with strokes, whether or not it would have been reckless for him to not have come in to see that patient. Remember, we know what Dr. Kaira's own impression of at least one of these CMTs was. But we don't even know that the CMT talked to him. The only person we know for sure that I see in this record is the nurse. Right. Later. I mean, your briefing includes lots of later observations, but nobody seems to have thought to pick up the phone and communicate them to Dr. Kaira. Remember, Dr. Kaira wants to hear about if there's worsening of symptoms. And to the extent that this stroke wasn't progressing to the extent that there were worsening of symptoms, it doesn't mean that it's not a stroke. And it doesn't mean that a jury might have concluded that it was reckless for Dr. Kaira not to have seen this patient. Instead of relying on CMTs and nurses to be the eyes and ears for him of this very important condition that needed to be medically managed immediately if it was, in fact, a stroke. And it was. And so I just don't think that the district court can find as a matter of law that it wasn't deliberately indifferent. And I think that a jury could easily conclude. And I think that I don't believe that this court can affirm the district court's finding that as a matter of law, these facts and evidence would preclude a finding of deliberate indifference by a jury. Well, I mean, what we need to do, and this is very common in these cases, is find something in the record that a rational trier of fact could say pushes it over the line from negligence, from gross negligence, from difference of medical opinion, which might not be either one of them. It might just be. So there are at least three other possibilities. And, you know, if he had said, don't call me back anymore, you know, I'm going to go off, you know, hunting this afternoon or something, maybe that's the kind of thing that you need something to tell you. You can't just let the jury. This is the system we have now. I mean, you can't let the jury just say, gee, that looks deliberately indifferent to me when the symptoms themselves are ambiguous. Well, some point one way, you conceded that at least one points one way, others point the other way. Obviously, we all know it's a sad case, of course. We all know in 2020 hindsight, it was a stroke. There's a limited period of time after a stroke to really intervene effectively, three or four hours, maybe at the outside. For him, it's all weekend. This is a sad story. But is it Dr. Kaira's fault? He's not that Mr. Davis isn't suing the nurses for failing to get back to Dr. Kaira urgently enough. And I understand that, but the point is what a jury could hear and a jury would hear if this were allowed to go to trial. But what evidence pushes it over? If the jury were to believe some piece of evidence, what is it that would allow it to say this is not just negligence, not just gross negligence, it's deliberate indifference? Sure. And I want to go back to one of your points, which is that if he had said, I'm going to go hunting and I'm not going to come see this person, that would be great. If I had cases that were deliberate indifference and that were the facts, it'd be terrific. But that is never the case. What always happens is that the jury... Hopefully, it means not very many people are deliberately indifferent. Well, I would respectfully disagree with that because I've got lots of cases that involve deliberate indifference. And unfortunately, what the jury would be confronted with in circumstances like that is listening to Dr. Kaira, listening to whether or not what he says makes sense. Because in this particular case, he's going to testify. If he were to testify at trial, I've treated stroke patients. I know what the signs and symptoms of stroke are. I know how important it is to address the issues of stroke if there's a stroke. And in this particular case, I just didn't think there was a stroke. It was a Saturday and I was relying on the CMTs and nurses. And a jury may go, what? That doesn't make any sense at all. You're the doctor. You're the only person that can diagnose. You're the only person that can make the call to transfer this person to a facility where he can get the care. So I don't think the absence of Dr. Kaira laying on the sword and saying, I wanted to go hunting instead of coming in on the weekend, is fatal to the issue of whether or not a jury should have been in the position to make the conclusion on his credibility as to whether or not there's factual evidence that supported the position that Dr. Kaira was deliberately indifferent, that he knew it was a serious condition. He only knew it might be a serious condition, I'm going to say. And what you're not addressing is the alternative hypothesis that he was entertaining, which was this is his reaction to dialysis. Fluids in your body are all changed out in dialysis. Headache, a strange feeling in your head could easily, I'm not a dialysis expert, but it seems to me that's what he was told, that these symptoms are the same ones he's obtained from dialysis before. Right. And a jury would be the best person to weigh that evidence. Is the jury the doctor? I don't understand that at all. What's that? I mean, the doctor's given two hypotheses. One, I'll assume based on his knowledge favorably to you, is stroke. The other is adverse reaction to dialysis, which presumably when the dialysis is over, it passes eventually. It's not the kind of thing you rush off to the hospital for. And if we're in equipoise, how do we know, or what justifies our saying that he was deliberately indifferent? Because it's requiring a factual conclusion, that the jury's in the best position to say whether or not they believe. A lay jury can't do that without expert testimony. Can't evaluate whether the alternative hypothesis that the doctor was entertaining here, that it was a reaction to dialysis, is outside professional norms. And that's just the malpractice standard. That doesn't even get us to deliberate indifference. We don't have an expert on the malpractice case because the deadline was blown. I'm not sure I agree with you, Your Honor, that the plaintiff has to produce an expert to testify about... If it's something as complicated as whether this is a stroke or a dialysis reaction, a lay jury can't evaluate that. But the jury's going to hear from Dr. Cairo, who's going to testify about this and this. And the jury's going to be able to weigh the credibility of his assessment. Not without some medical testimony or medical evidence that dialysis was ruled out by what was being reported to the doctor. I'm sorry, say that one more time. That dialysis was ruled out, a dialysis reaction. Well, I don't... I mean, that's what differential diagnosis is. Right. We've got equipoise here. This could be one thing, it could be another thing. And he's had this reaction before, so watch and see. And you'd need a medical expert to say that that's deliberately indifferent. My time's up, but if I could just make a point as to what you're saying. Dr. Cairo never ruled out anything among those things that were contained within his differential diagnosis. And Dr. Cairo would say, when a doctor has a differential diagnosis, we prioritize with those things that are most problematic and concerning and have the greatest likelihood of causing death or major injuries. And the jury will hear that and will decide whether or not it was reasonable that he did that or whether or not, given his understanding and his background in treating stroke patients and the importance of early intervention, whether or not it was reckless for him to refrain from coming in or referring the patient and whether or not that constitutes deliberate indifference in violation of the Eighth Amendment. Okay, so I know you're just about out of time, so I'll see if I need to go ahead one more time. Thank you. Yes, Ms. Ho. May it please the court, counsel? It's our argument, and since the court has already identified that, the only evidence in the record establishes that Dr. Cairo did not know that Mr. Davis was experiencing stroke-like symptoms based on the single telephone conversation that he had in the early morning hours of June 21st, 2014 with nurse, because he was on call that day. It was a Saturday. And also based on his medical judgment, that his symptoms that were given to him at that time could have been also contributed based on reactions that he had had in the past based on dialysis. This court has already outlined, based on the questioning of the appellant, what our position is. Do we have any evidence in this record about Dr. Cairo's knowledge about strokes, about the urgency of treatment within any given period of time, or his experience with treating strokes? During his deposition, he was questioned about that by the plaintiff's counsel, and he did indicate that he had past experience prior to entering as a director of the prison system of strokes, and he was aware of the LA Stroke Scale, and that's the basis for his questioning of the nurse on the telephone, of asking of the different symptoms and why he asked those questions, and that he did know that urgency was an issue with respect to strokes. And so, yes, he did provide that testimony during his deposition. Ms. Hull? Yes. What are we to make of the doctor's request that the next nurse on duty place a call, because he might have more confidence, I think, in that? That call never comes, does it? No, he never... And he does not call back to find out why the nurse who we would have more confidence in didn't call? No. The record is clear that he did not receive any follow-up phone call from the nurses. Right. Are we to make anything of the fact that he then, receiving no call, and having received what he thought was conflicting evidence of whether it was a stroke or not, that he does nothing? Well, he stated that he received, yes, some conflicting... I think when he testifies that he received conflicting information, he meant the difference between whether it was a stroke or it was a reaction to the dialysis that Mr. Davis had had. Exactly. Yes. So he would like the incoming nurse, where he seems to place greater confidence, to call him. In other words, he's seeking further information, right? No, Your Honor. What he says is that he would like the incoming nurse who he had more confidence in to give him a call if there were worse mean symptoms. And Dr. Kaira testifies that he did not receive any follow-up call, so it was his presumption that there weren't any worsening symptoms. And that's why he did not receive a follow-up call from any nurse. And it wasn't until he arrived at the facility during his normal working hours then, on Monday, June 23rd, when he arrived and actually physically assessed Mr. Davis, and he noted that he did, in fact, have stroke-like symptoms, that he immediately sent him to the emergency room. Well, it's troubling to me that on Saturday and Sunday there's greater indications. There's some responsibility, I assume, by the nurse to follow the direction of the doctor to place a further call. And maybe I'm asking you, is there any responsibility on the part of the doctor when not receiving that to just assume that of the conflicting views he got that it should tilt toward dialysis as opposed to stroke? I don't believe there's any responsibility on him to have to follow up when Mr. Davis has had these type of symptoms in the past and they've resolved. I don't think that it was leaning toward it was an actual stroke. I mean, when he went through the four different factors of stroke on the telephone with the nurse, there was only one that was indicative of a stroke, and it was kind of ambiguous in light of the other factors that leaned toward the reactions he had had. But isn't that the information? That's the sole information he got, right, that conversation you described? Correct. And that conversation leaves him conflicted? I think his testimony was that it left him, and I want to look and see what the exact testimony was. But I believe, I don't know if the exact words were that he was conflicted, but I think that he, I don't believe conflicted was the exact words that he used, but he testified that it left him confused, I think might have been the word that he used. Yeah, fine. Yeah, confused. Well, confused may even be stronger, in my view, than conflicted. So he's conflicted and directs that the incoming nurse, who he expects to have more confidence in, should call him. If the symptoms worsened. So at that time, he did not believe that the symptoms were indicative of a stroke. He did not believe that at that time. The symptoms got worse, did they not? According to, if you read the records, the nurse's notes. The nursing notes. Yes, but those notes were never, there's nothing in the record, or any evidence that shows that those nursing notes were, during the time period between the first phone call, or the only phone call, to Dr. Caire, and the time he arrived on June 23rd, that those nursing notes were read to Dr. Caire, or he knew about them at all. Right, they were not communicated to him. They were not communicated to him, correct. So he had no knowledge of those nursing notes. But if you read them, and Dr. Caire was presented with those nursing notes at his deposition to read them into the record, of course, and he did testify at that time that they did indicate a worsening of his symptoms. But he had no knowledge of those notes at the time, because they were not communicated to him. No, my inquiry is focused on what responsibility a doctor receiving the information on Friday is to follow up when the issue is a possibility of a stroke. I'm not going to give you a 50-50, but that clearly is in play. So your position is that he really did need to do anything further than await a possible call. Well, that's my position just because that's what's in the record. There's nothing else in the record about what Dr. Caire's responsibility is. I mean, he didn't testify as to that at his deposition. That question was not asked, and there's no other evidence that was presented by the plaintiff as to the responsibility of Dr. Caire with respect to following up. So that's why that's my position. Thank you. Yes. Is there any further questions? I have none. Okay. And I would just ask that the Court affirm the judgment of the District Court in favor of Dr. Caire. All right. Thank you very much. Thank you. I will give you your time right now, but I will give you one minute for rebuttal, Mr. Sandberg. Thank you, Your Honor. I appreciate that one minute. You have a good point with what you just said about Dr. Caire and his responsibility. Again, this goes to Dr. Caire had never ruled out a stroke. It was within his differential diagnosis. He said that he wanted to hear from somebody if there was going to be any worsening of symptoms. He never heard from anybody about worsening symptoms, but he was relying upon someone whose judgment and whose belief about the way in which they assess patients. It lacked credibility. And another important thing about the findings that were from Saturday the 21st is that there were pinpoint pupils. I don't think that there's any evidence that was in Dr. Caire's testimony that pinpoint pupils, which would indicate a brain condition going on, is consistent with anything having to do with dialysis. So I just believe in this particular case it warrants remand to the district court for a trial. I do not believe that as a matter of law either the district court or this court to affirm can do that, that there was not a question of material fact as to whether or not there was deliberate indifference. I appreciate Your Honor's time. Thank you very much. All right. Thank you very much. Thanks to both counsel who take the case under advisement.